**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

U.S. EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
                                                    )
             Plaintiff,                     )     Civil Action No. 2:15-cv-1237
                                                    )
v.                                              )     Judge Mark R. Hornak
                                                    )
BOB EVANS FARMS, LLC,            )
                                                    )
             Defendant.                    )

## OPINION

**Mark R. Hornak, United States District Judge**

It is the rare lawsuit in which the record entitles a plaintiff to the grant of summary

judgment in its favor. This is one of those cases.

This case stems from the removal of Hayley Nadalin, née Macioce ("Macioce"),[1] who

was pregnant at the time, from the automatic shift scheduling process utilized by the Bob Evans

Farms, LLC ("Bob Evans") restaurant located in West Mifflin, Pennsylvania ("West Mifflin Bob

Evans"), where she worked as a server. The Equal Employment Opportunity Commission

("EEOC") brings this action alleging pregnancy discrimination pursuant to Title VII of the Civil

Rights of 1964 ("Title VII"), 42 U.S.C. § 2000e *et. seq.*, and certain amendments thereto,

including the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), and Title I

of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

The EEOC, charged with the enforcement of Title VII, is authorized by 42 U.S.C. §

2000e-5(f)(1) and (3) to bring this action. It seeks compensatory damages, punitive damages,

back pay and injunctive relief. Both parties have moved for summary judgment. (ECF Nos. 58

---

[1] Hayley Macioce changed her name to Hayley Nadalin after her marriage in April of 2015, see (ECF No. 64-1 at 5 [Macioce Dep. at 14]). The Court refers to her as Macioce throughout.

and 61). The EEOC moves for partial summary judgment, seeking judgment in its favor on liability and as to the "good faith" defense to punitive damages asserted by Bob Evans. (ECF No. 58). It also seeks an order setting a trial schedule for a jury to determine damages under 42 U.S.C. § 1981a and for the Court to determine the amount of any back pay to be awarded for the benefit of Macioce. *Id.* Bob Evans moves for summary judgment on the pregnancy discrimination claim against it, and also alternatively seeks summary judgment on the EEOC's claims for emotional distress, damages, and injunctive relief. (ECF No. 61).

## I.   STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A).

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial,* " or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(a), (e)) (emphasis in *Matsushita*). To meet its burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported

2

allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it so—the record evidence the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston v. Procter & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir.2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Matsushita,* 475 U.S. at 587–88; *Huston,* 568 F.3d at 104 (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson,* 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004); *Boyle v. Cnty. of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 589 (3d Cir.2005) (citing *Celotex Corp.,* 477 U.S. at 323–24).

3

"On cross-motions for summary judgment, the law in our Circuit is clear—the Court considers each Motion on its own merits, tested against the standards of [Federal Rule of Civil Procedure 56]." *Wallace v. Nat'l Indem. of Mid-Am.,* 2:14-cv-1253, 2016 WL 6948781, at *1 (W.D. Pa. July 8, 2016) (citing *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011)); *see also Home for Crippled Children v. Prudential Insurance Co.,* 590 F. Supp. 1490, 1495 (W.D. Pa. 1984). Accordingly, in considering whether either such motion now before the Court should be granted, "as to the Plaintiff's Motion, I am to view the record facts in a light most favorable to the Defendant. As to the Defendant's Motion, the opposite is the rule." *Wallace,* 2016 WL 6948781, at *1. On cross-motions, seemingly contradictory positions do "not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives . . . determination [of] whether genuine issues of material fact exist," *Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3d Cir.1968), preventing judgment in favor of the other party. The standards under which a court grants or denies each party summary judgment do not change by virtue of cross-motions being presented. *Home for Crippled Children,* 590 F. Supp. at 1495.

Succeeding on an affirmative summary judgment motion filed by a plaintiff, such as that filed by the EEOC here, can prove a particularly difficult but not insurmountable task. This is because the EEOC, as plaintiff:

> bears the burden of proof on the [discrimination] claim. "After all, the burden of proof includes the obligation to persuade the factfinder that one's propositions of fact are indeed true. Thus, if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will."

*Wallace,* 2016 WL 6948781, at *3 n. 2 (citing *El v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007)).

4

## II.   FACTS

The following material facts are undisputed[2] unless otherwise noted. In 2009, Macioce began working as a server at the West Mifflin Bob Evans. (ECF Nos. 60 [EEOC's Concise Statement of Material Facts], 72 [Bob Evans' Response to EEOC's Concise Statement of Material Facts], at ¶ 1). As a part-time server, Macioce was not guaranteed any set number of work hours. (ECF Nos. 63 [Bob Evans' Concise Statement of Material Facts], 75 [EEOC's Response to Bob Evans' Concise Statement of Material Facts], at ¶ 17). In 2012, at a time when Jay Moreau ("Moreau") was then the Assistant General Manager at her location, (ECF No. 64-1 at 7), Macioce gave birth to her first child. She neither needed nor took leave prior to childbirth in 2012, and she requested and received leave after that childbirth without any problem. (ECF Nos. 63, at ¶¶ 19, 20, 21; 75, at ¶ 17).

By 2014, Jay Moreau ("Moreau") was the General Manager at the West Mifflin Bob Evans. (ECF Nos. 60, 72, at ¶ 3).    As General Manager, Moreau's responsibilities included shift-scheduling, and he also was one of the people designated by Bob Evans to implement its anti-discrimination policies and procedures. (ECF Nos. 60, 72, at ¶¶ 4, 5, 6). Throughout his employment at Bob Evans, Moreau was aware that it is illegal to discriminate as to terms and conditions of employment on the basis of pregnancy.    (ECF Nos. 60, 72, at ¶ 5).

Bob Evans uses an automated computer-based scheduling system to create employee schedules based on factors such as employees' availability and the anticipated needs of the restaurant. (ECF Nos. 60, 72, at ¶ 8). Subject to manager approval, servers are able to change

---

[2] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

their own availability in the computer system for the purpose of the automatically generated shift schedule. (ECF Nos. 60, 72, at ¶ 9).

According to Bob Evans' Employee Handbook, its seven-day workweek runs from the beginning of business on Thursdays and ends at the close of business on Wednesdays. (ECF No. 58-10). In his deposition, Moreau explained the scheduling process. Although the General Manager is responsible for the schedule, the Assistant General Manager also has scheduling duties, including filling in any gaps if there are any glaring holes in the automatically generated schedule and addressing issues such as when a scheduled employee calls in sick. (ECF Nos. 64-3 at 25; 58-3 at 18 [Moreau Dep. at 73, 74]). The automatic scheduling system generates a schedule on the Thursday two weeks in advance of that schedule's start, to which last-minute changes or adjustments typically may be made by management up until the following Wednesday, and then the next day, on Thursday, employees have access to see the "finalized" schedule on-line and where it is posted on an office door. (ECF No. 58-3 at 11-14 [Moreau Dep. at 40, 42, 43, 44]). Moreau also could handwrite or "pencil-in" someone onto the finalized posted schedule. (ECF No. 64-3 at 21 [Moreau Dep. at 57]). So, for example, the automatically generated schedule for the workweek beginning Thursday, August 7, 2014, initially would have been generated as a draft on Thursday, July 24, 2014, to which last-minute changes or adjustments would have been made in the system by management up until the following Wednesday, July 30, 2014, and then it would have been posted on Thursday, July 31, 2014, detailing for employees the schedule for work hours that began on August 7, 2014. (ECF No. 64-3 at 11-15 [Moreau Dep. at 41-46]).

6

From January 1, 2014 through July 1, 2014, Macioce averaged approximately 22 hours of work a week. (ECF Nos. 63, 75 at ¶ 18). The parties, however, dispute the number of "shifts"[3] that Macioce typically was scheduled to work in an average workweek prior to her removal from the automatic scheduling process. The EEOC contends Macioce generally worked on five days in a work week. (ECF Nos. 59 at 3; 60, at ¶ 17). Bob Evans contends that Macioce typically worked on four days in a week, based not on its own work records but rather the testimony of Moreau that his "understanding" was that on a weekly basis she worked a "approximately four days a week." (ECF Nos. 72, at ¶ 17, 19; 64-3 [Moreau Dep. at 56-57]). Review of the actual work records that Bob Evans produced in discovery reveals that in the 49 workweek period beginning from Thursday, August 8, 2013 through Wednesday, July 16, 2014, Macioce was scheduled for 4 shifts a week in 9 of those weeks, was scheduled for 6 shifts a week in 2 of those weeks, and was scheduled for 5 shifts a week in 38 of those workweeks. (ECF No. 58-9). Thus, she was far more often scheduled for 5 shifts a week and in that 49 week period she was scheduled to work shifts on average 4.86 days per week.

In July of 2014, Macioce was pregnant with her second child with a due date in September 2014. (ECF Nos. 60, 72, at ¶ 2). Macioce testified that she was available for work and intended to work up until she gave birth to her second child, (ECF Nos. 60 at ¶ 18; 64-1 at 38), which ultimately occurred on September 12, 2014. (ECF No. 64-1 at 8). In mid-July of 2014, just before Macioce was scheduled to be on vacation from July 21 through July 29, 2014, (ECF No. 58-2 at 8 [Macioce Dep. at 98]), Moreau and Macioce had a conversation about her future work schedule. Because Moreau believed Macioce's pregnancy due date was "imminent"

---

[3] Bob Evans questions the EEOC using the term "shift" in opposition to Bob Evan's motion for summary judgment without precisely defining the term, (ECF No. 76 at 6), despite the reality that the testimony by Bob Evans' Assistant General Manager Virginia Giaquinto and its General Manager Moreau as well as Bob Evans' own statements of fact, briefs and arguments refer similarly and repeatedly to the term "shift" without providing a definition. The Court takes the term "shift" simply to mean the period of work on a given workday.

and that delivery of her child "could happen any day," Moreau asked Macioce when she planned to take a leave of absence due to her pregnancy. (ECF No. 72 at 9-10 [Bob Evans' Separate Concise Statement of Undisputed Material Facts in response to EEOC's motion for summary judgment, at ¶¶ 19, 20, 22, 23]). Macioce did not state her due date to Moreau at this time, did not request a leave of absence, (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in response to EEOC's motion for summary judgment, ¶ 23), and did not request that Moreau change or eliminate her availability in the automated scheduling system. (ECF No. 58-3; 64-3 at 19 [Moreau Dep. at 55]).[4] Macioce indicated to Moreau that she would work until she had the baby. (Macioce Dep. at 100-101, 58-2 at 11; ECF No. 75 at ¶ 26).

The parties also dispute certain aspects of the conversation between Macioce and Moreau that took place in mid-July, 2014 regarding scheduling. Macioce testified that Moreau approached her and asked her when she was going to take a leave of absence, and when she responded that she was going to work until she had the baby, Moreau asked her if she could change her availability in the system. When she asked him why he wanted her to do this, Moreau responded that he didn't "want to get screwed over if [she had] the baby." (ECF No. 64-1 at 20-21 [Macioce Dep. at 101; Moreau Dep. At 100-101]). Moreau then again asked her to change her own availability. Macioce told him no, told him she was planning on working until she had the baby, and then walked away. (ECF No. 64-1 at 21 [Macioce Dep. at 101]). As she was waiting on tables and despite her indication that she did not want a change in her

---

[4] The EEOC asserts in its Concise Statement of Facts at ¶ 13, (ECF No. 60), that "Macioce did not request Moreau to change her availability to 'zero.'" This fact is supported by citation to Moreau's testimony providing in response to the question "[d]id Macioce request that you change her availability in the automated scheduling system," the unequivocal response "[s]he did not." (Moreau Dep. at 55). If she did not ask for any change, then necessarily she did not ask for a change to zero. Bob Evans indicates that it "disputes" this fact. (ECF No. 72 at ¶ 13). Suffice it to say that if an attempted dispute is not properly supported by the evidence viewed in the light most favorable to the non-moving party it is inadequate to create a genuine issue of material fact. In its papers, Bob Evans indicates it disputes certain facts when it really just contests their legal import—which it was free to do throughout its briefing and at oral argument (ECF No. 80), and which arguments the Court has considered.

availability, Moreau nevertheless told her: "I'm just taking you off the schedule, but you're still going to get your hours." (ECF No. 64-1 at 21 [Macioce Dep. at 101]).

Moreau could not recall all of what was said in the conversation with Macioce, (ECF No. 64-3 [Moreau Dep. at 49, 50, 55, 56]), but disputed that Macioce ever objected when he told her that he was taking her off of the automatic scheduling. (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment,[5] ¶ 29). According to Moreau, at that time, Macioce told him that she was pregnant but did not tell him her due date, (ECF No. 64-3 at 17, 19 [Moreau Dep. at 49, 55]), and Moreau told Macioce that he was going to adjust the automatic scheduling system and set her availability to "zero" so that Macioce would not continue to be automatically scheduled, (ECF Nos. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in response to EEOC's Motion for Summary Judgment, ¶ 25; 58-3 at 14, 17 [Moreau Dep. at 50, 55]), but that he would continue to give her shifts, and that she needed to continue to call-in to indicate that she was still available to work. (ECF No. 64-3 at 17-18, 19 [Moreau Dep. at 49-50, 55]). Moreau testified that he did not recall what Macioce said in response to his final determination that he would remove her availability for automatic scheduling in the automated system, but he did specifically recall that she did not object. (ECF No. 64-3 at 19 [Moreau Dep. at 55]).[6]

---

[5] In response to the EEOC's Concise Statement of Material Facts, Bob Evans provided its position as to what it disputed and also included and thereafter in the same document added a section entitled its "Separate Concise Statement of Undisputed Facts." (ECF No. 72 at 6). For clarity, the Court identifies the "Separate Concise Statement."

[6] Testimony that one does not recall certain events is not equivalent to testimony that it did not happen. *Broad Music, Inc. v. Allis*, 667 F. Supp. 356, 358 n.2 (S.D. Miss. 1986) ("An affiant's failure to remember an event is not a specific denial that the event occurred for purposes of summary judgment."); *Hideout Records & Distributors v. El Jay Dee, Inc.*, 601 F. Supp. 1048, 1053 (D. Del. 1984) ("First, Mrs. Nelkin's statement that she cannot remember hearing the songs played does not place in dispute the statements of Hood and Verna that the songs were in fact played since an affiant's failure to remember an event is not a specific denial that the event occurred. *See, e.g., Lemelson v. The Bendix Corp., et al.*, C.A. No. 82–308, Slip Op. at 3, fn. 2 (D. Del., January 23, 1984)."). A failure to recall an event without a denial that it happened coupled with affirmative evidence that the event happened, is insufficient to create an issue of material fact preventing summary judgment. *Bixler v. Cent. Pennsylvania*

9

Moreau, as he said he would, took Macioce out of the automated scheduling system. (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment, ¶ 26). He indicated that he did so because she was pregnant, he believed her need for leave was imminent,[7] and he wanted to ensure that the restaurant's staffing needs were met. (ECF Nos. 58-3 at 18 [Moreau Dep. at 74]; ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment, ¶ 26). Moreau's belief that Macioce's due date was imminent was based on the fact that she was pregnant and that he had heard "hearsay" from other employees that "she was close." (Moreau Dep. at 54). Moreau expected Macioce to keep him apprised if she wished to continue to work and was able to work. (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment, ¶ 28).[8]

---

*Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1301–02 (3d Cir. 1993); *see also Tinder v. Pinkerton Security*, 305 F.3d 728, 735–36 (7th Cir.2002) (finding that employee failed to create a genuine issue of fact for trial where employee asserted in an affidavit that she "[did] not recall seeing or reviewing the Arbitration Program brochure" and employer asserted to the contrary); *cf. Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 162 (3d Cir. Mar. 24, 2009) (distinguishing between allegations that plaintiff "was never provided with a copy" of the relevant documents and allegations that the plaintiff "merely could not 'recall seeing or reviewing' them" and concluding that the plaintiff's evidence that she never received the documents, as opposed to being unable to recall seeing them, was sufficient to create a genuine issue of material fact); *Wagner v. Unison Admin. Servs., LLC*, Civ. Act. No. 07-1008, 2009 WL 891870, at *8 (W.D. Pa. Mar. 31, 2009) (Plaintiff did not create a genuine issue of fact where "[d]uring his deposition, Plaintiff testified that he did not recall receiving the entire application, but significantly did not deny that he received the entire application."). Nevertheless, testimony involving a failure to recall when viewed in the light most favorable to the non-moving party may be sufficiently equivocal when considered in context in a particular case such that a court properly views the stated failure to "recall" as equivalent to a denial that the event happened for summary judgment purposes.

[7] Moreau's testimony refers vaguely to a "policy" he had, such that when someone told him that they would be taking time off "imminently" that he would not have a schedule "generated by the computer for the foreseeable future until they were coming back." (ECF No. 58-3 at 16 [Moreau Dep. at 54]). Moreau, however, could not recall any occasion, other than the one at issue here involving Macioce, when he had changed another employee to "zero" availability in the automatic scheduling system because of an "imminent event that was going to happen" or where no leave of absence had first been requested by the employee. (ECF No. 64-3 at 26 [Moreau Dep. at 75]).

[8] The EEOC notes a dispute regarding the "screwed over" comment citing only to Bob Evans' Answer to the Complaint. (ECF No. 59 at 3 n. 5 (citing ECF No. 49 at ¶ 14)). As the EEOC does not contend in its present motion that the comment is undisputed, the Court accepts for purposes of the EEOC's motion the characterization of this fact as being adequately disputed by Bob Evans at this juncture. Other than the "screwed over" statement, Macioce does not contend that any derogatory comments were made regarding her pregnancy. (Macioce Depo at 107). Based on the parties' disputed evidence, for purposes of the EEOC's motion the Court will not consider as an

After the mid-July 2014 conversation, Macioce went on her previously scheduled vacation, (ECF No. 58-2 at 8 [Macioce Dep. at 98]), and returned to a change in the way she was to be scheduled for shifts at Bob Evans. The evidence regarding Macioce's work schedule after she returned from vacation is somewhat less certain. Certain exhibits produced by Bob Evans and attached to the EEOC's filings are in rather miniscule print. At times the parties refer to shifts being handwritten onto the schedule and shifts being penciled in, which the Court takes to be functionally the same thing. Additionally, copies of the actual schedules on which Macioce was penciled in or handwritten in are unavailable because they are not retained, (ECF No. 64-3 at 23 [Moreau Dep. at 61]), but the computer generated schedules and "raw punch" records of shifts actually worked are. *See, e.g.,* (ECF Nos. 58-7; 70-12; 70-22). The Court has therefore plowed through these filings to assess just what the record establishes in these regards.

On or about August 1, 2014, Moreau changed Macioce's availability in the scheduling system to "zero" effective for shifts beginning the week of August 7, 2014. (ECF Nos. 60, 72, at ¶ 10, 15; 72, at ¶ 19). After removing her from the automatic scheduling, Moreau only added her onto the schedule by handwriting (or penciling) her in for shifts for the first week that she was no longer automatically scheduled for shifts, but not for any other weeks. (ECF No. 64-3 at 22, 23 [Moreau Dep. at 67, 60]). Moreau did not speak with Macioce regarding these shifts, and instead Giaquinto, also responsible for scheduling duties, informed Macioce when she was put on the schedule. (ECF No. 64-3 at 22, 25 [Moreau Dep. at 60, 73]).

To obtain shifts after Moreau removed her from the automatic scheduling, Macioce spoke with Giaquinto, shift leader Heather Hathaway, and another manager, Kathy Schneider, but did

undisputed fact Macioce's stated objection to Moreau that her availability not be changed to zero and the contention by Macioce that Moreau had indicated he did not want to be "screwed over" in scheduling by her pregnancy and childbirth, but it may consider them in regard to Bob Evans' motion.

not discuss additional shifts with Moreau. (ECF No. 64-1 [Macioce Dep. at 102]). Macioce told Giaquinto that Moreau had taken her off of the schedule and Giaquinto used Macioce to supplement the schedules she was working on and to fill in the gaps in the schedule for that upcoming week. (ECF No. 70-8 at 10-11, 12). Giaquinto understood that Macioce was not pleased at being taken off of the automated schedule. (ECF No. 70-8 at 11, 12 [Giaquinto Dep. at 26, 32]). Giaquinto, however, was not instructed by Moreau to give Macioce any number of work hours in the wake of Moreau "zeroing" out Macioce's availability in the automated system. (ECF No. 70-8 at 10, 12, 13). Additionally, Macioce could not simply be scheduled for the number of shifts or days she usually worked prior to being removed from the automated scheduling or for any work when she was not needed, but could only be scheduled if there was a "hole" in the automatically generated schedule or an additional need for a particular shift. (ECF Nos. 58-8 at 5-6; 70-8 at 12, 13).

Macioce asked for shifts from Giaquinto at least three times in person, (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment, ¶ 31),[9] and sat down with Giaquinto when Giaquinto was going over the schedule. Heather Hathaway was able to find shifts for Macioce to work on Saturday August 16th and Sunday August 17th. (ECF No. 58-2 at 5 [Macioce Dep. at 126]). When Macioce called in and spoke with Kathy Schneider regarding being added to the schedule, Macioce was told no one had called off for that morning. (ECF No. 58-2 at 14 [Macioce Dep. at 125]).

---

[9] Bob Evans indicates that Macioce asked Giaquinto for shifts while Macioce actually was working a shift and appears to imply that Macioce's request somehow was not a legitimate request to be added to the schedule because she was already working at that same time. *See, e.g.* (ECF Nos. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in Response to EEOC's Motion for Summary Judgment, at ¶ 31; 65 at 5; 69 at 5). The only reasonable takeaway from this is that Macioce indeed sought to be added to the schedule, as her General Manager made the decision to remove her from the automated system, had not added her to the schedule for the same amount of shifts per week she ordinarily would work as he had not added her at all beyond the first effective week of her removal, and instead left her to find replacement shift work—which was not always available. Moreover, it indicates (consistent with Moreau's testimony) that he expected Macioce to call-in for shifts to show that she was still capable of working despite her pregnancy and presumably had not gone into labor.

12

Bob Evans produced in discovery a document displaying shifts that were auto-scheduled by the scheduling system, shifts manually added in the system and shifts manually deleted in the system for the relevant time period. (ECF No. 58-7; *see also* ECF No. 70-22). After the mid-July conversation, in addition to Moreau eliminating Macioce's availability in the automated system so that she would no longer be automatically scheduled for shifts effective August 7, 2014, on three separate occasions he deleted shifts for which Macioce previously had been automatically scheduled to work, amounting to a total of twelve out of fifteen such shifts being actively deleted from the schedule. (ECF No. 58-7 at 4). Specifically, on July 18, 2014, Moreau deleted in the scheduling system shifts that had been auto-scheduled for Macioce to work on July 31, 2014 and August 1, 2014. (ECF No. 70-1, ¶ 6, Exhibit F at 3). Then, on July 27, 2014, Moreau deleted shifts that had been auto-scheduled for Macioce to work on August 7, 8, 10, 11 and 12, 2014. *Id.* Finally, on August 1, 2014, Moreau deleted shifts that had been auto-scheduled for Macioce to work on August 15, 17, 18, 19, and 20. *Id.* Thus, Moreau removed Macioce from the automated schedule system for shifts to be worked by her on July 31, 2014 and on August 1, 7, 8, 10, 11, 12, 15, 17, 18, 19 and 20, 2014. Macioce, however, worked shifts previously automatically scheduled for August 3, 4, and 5, 2014. (ECF Nos. 60, at ¶ 20).

Ultimately, Moreau penciled Macioce onto the schedule for shifts she worked on August 9 and 10, 2014, and another manager penciled her onto the schedule for August 22, 2014. (ECF Nos. 72, at ¶ 19; 74-4 at 14-15 [McFarland Decl., at ¶ 9 & Ex 5]). Beginning on August 13, 2014, Assistant Manager Giaquinto added Macioce to the schedule. (ECF No. 58-7 at 4). Macioce was manually added to the schedule for shifts on August 16, 17, and 18. (ECF Nos. 72, at ¶ 19; 74-4 at 14-15 [McFarland Decl., at ¶ 9 & Ex 5]). Thus, from the workweek beginning on August 7, 2014 through September 12, 2014, when Macioce delivered her baby, Macioce was

scheduled for six shifts. (ECF No. 72, at ¶ 20). Bob Evans did not schedule Macioce for any

work after August 22, 2014. Macioce did not "call-in" regarding work after August 22, 2014,

(Macioce Dep. at 130), but she never indicated to Bob Evans that she was unable to or did not

want to work, and in the wake of being removed from the automatic schedule she affirmatively

indicated that she desired shifts via her prior requests for shifts from the assistant managers, by

putting her name and phone number on shift cards, and by indicating to co-workers her

availability via "facebook" messages. (ECF Nos. 70-2 at 69-71; 70-4, at ¶¶ 5-6 [Macioce Decl.]).

The document described as Macioce's "raw punches," meaning shifts Macioce actually

worked, reveals that after Macioce returned from her July 2014 vacation, she ultimately was

scheduled for and worked shifts as follows:

- For the workweek beginning July 31, 2014, she was scheduled for and worked three shifts—one on August 3rd, 4th and 5th.
- For the workweek beginning August 7, 2014, she was added to the schedule and worked two shifts—one on August 9th and 10th.
- For the workweek beginning August 14, 2014, she was added to the schedule for three shifts, but worked only the shifts on August 17th and 18th, 2017.[10]
- For the workweek beginning August 21, 2014, she was added to the schedule and worked one shift on August 22nd.
- For the workweeks beginning August 29, September 4, and September 11, 2014, she was not added to the schedule for any shifts.

(ECF No. 70-12 at 3).

After having her baby, Macioce decided not to return to work at Bob Evans. (Macioce

Depo at 48); (ECF No. 72, Bob Evans' Separate Concise Statement of Undisputed Facts in

Response to EEOC's Motion for Summary Judgment, ¶ 43). Subsequently, Moreau ceased what

he referred to as his "practice" of telling a person taking a leave of absence that he would change

---

[10] The evidence establishes that Macioce was given a shift for the evening of August 16, 2014, but due to a miscommunication she was unable to work that scheduled shift. There is no evidence to show any discrimination in the miscommunication.

their availability in the system to zero. (Moreau Dep. at 75). Moreau resigned employment with

Bob Evans on October 27, 2016. (ECF No. 74-4 at ¶ 10).

## A. Bob Evans' Anti-Discrimination Policy

Bob Evans' February 2013 employee handbook, in its section labelled "Equal

Employment Opportunity Policy," states:

> Bob Evans Farms, LLC offers equal employment opportunity to all job applicants
> and gives all employees equal consideration in our employment practices. Bob
> Evans abides by all local, state, and federal laws regarding equal employment
> opportunity. Bob Evans will . . . administer all personnel actions such as
> compensation, benefits, promotions, transfers, and all other aspects of
> employment in a consistent and non-discriminating manner.

> If you believe that you have been subject to conduct which violates this policy, or
> if you have questions concerning this policy, please contact any member of the
> management team, the Human Resources Department, or use the Open Door
> Policy.

(ECF No. 58-10 at 3). The "Open Door Policy" in the 2013 Handbook provides that it

encourages employees to raise concerns and address situations with their supervisor or a member

of human resources, including decisions the employee thinks are "unfair." (ECF No. 58-10 at 3).

The Bob Evans May 2014 employee handbook includes the virtually identical "Equal

Employment Policy" and "Open Door Policy," (ECF No. 64-4 at 6), but it also includes a section

labelled as its "Harassment & Discrimination Policy," that further provides:

> Harassment, discrimination, or retaliation of any kind toward fellow employees,
> guests, or business affiliates which is based on race, color, religion, genetic
> information, gender, national origin, age, disability, citizenship, military status,
> ancestry, sexual orientation, or any other protected characteristic is prohibited.

> If you feel you are the subject of harassment, discrimination, or retaliation, please
> report it to your supervisor, the Human Resources Department or use the Open
> Door Policy. Where investigation confirms the allegation, prompt disciplinary
> action will be taken, up to and including termination of the offending
> employee(s).

15

(ECF No. 64-4 at 5; ECF No. 72, at ¶ 23). Prohibited discrimination on the specific basis of pregnancy is not mentioned in any of the policy provisions.

Moreau was responsible for ensuring that employees at the West Mifflin Bob Evans were aware of company policies and procedures, which included him going over the open-door, anti-harassment and anti-discrimination policies with them. (ECF No. 58-3 at 6-7 [Moreau Dep. at 35-36]). He was required to acknowledge receipt of the Bob Evans Employee Handbook, (ECF No. 64-3 at 5-6 [Moreau Dep. at 12, 23]), but did not recall any video training or anyone else coming to the restaurant to do in-person staff training. (ECF No. 58-3 at 8 [Moreau Dep. at 37]). Macioce could not recall taking anti-discrimination policy training or that Bob Evans had anti-discrimination and open door policies, yet she acknowledged receipt and review of the May 2014 Handbook by her signature dated April 30, 2014. (ECF Nos. 64-1 at 18; 64-4 at 8; 70-4, at ¶ 3).

## III.  DISCUSSION

As to its motion for summary judgment on liability, Bob Evans asserts that the EEOC cannot raise an inference of discriminatory motive under the familiar burden-shifting framework for indirect evidence cases and also cannot establish the existence of an adverse employment action. In no uncertain terms, Bob Evans insists that its General Manager Moreau removed Macioce from the automated employee scheduling system not because of Macioce's pregnancy, but "because he believed her due date was imminent and, consequently, her attendance in the near future was unpredictable." (ECF No. 65 at 1). Bob Evans further states that "the sole reason Moreau took Macioce off the schedule was due to the unpredictability of her attendance," (ECF No. 65 at 13), and her "'imminent', unpredictable leave." (ECF No. 65 at 14). Bob Evans also argues that Moreau made the decision to remove Macioce from the automated scheduling system

"for the predictability of the schedule" to "ensure the restaurant's staffing needs." (ECF No. 65 at 14).

In contrast, the EEOC contends that there is no genuine issue of fact on this point, and that the undisputed direct evidence, as further confirmed by the position of Bob Evans in its briefing, unequivocally establishes as a matter of law intentional discrimination against Macioce based on her pregnancy.

## A.    The Pregnancy Discrimination Act ("PDA")

Title VII prohibits discrimination in employment "because of sex." 42 U.S.C. § 2000e-2(a). Specifically, § 2000e-2(a) provides:

**(a) Employer practices**

It shall be an unlawful employment practice for an employer—

> **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

The PDA, 42 U.S.C. § 2000e(k), was passed by Congress in response to the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), in which the Court had held that discrimination "because of pregnancy" was not prohibited discrimination "because of sex" under Title VII. "The PDA specifies that sex discrimination includes discrimination on the basis of pregnancy." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 277 (1987). The United States Supreme Court explained in *Guerra* that:

[r]ather than limiting existing Title VII principles and objectives, the PDA extends them to cover pregnancy. As Senator Williams, a sponsor of the Act, stated: "The entire thrust ... behind this legislation is to guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life." 123 Cong. Rec. 29658 (1977).

*Guerra*, 479 U.S. at 288–89. Specifically, Congress amended Title VII to add a definition of the

term "because of sex." Section 2000e(k) thus provides:

### § 2000e. Definitions

For the purposes of this subchapter--

\*\*\*\*

**(k)** The terms "because of sex" or "on the basis of sex" include, but are not limited to, *because of or on the basis of pregnancy, childbirth, or related medical conditions*; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. . . .

42 U.S.C. § 2000e(k) (emphasis added).

As *Johnson Controls* explains, passage of the PDA established that "women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job." 499 U.S. at 204. "The [PDA] has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." 499 U.S. at 199. Therefore, the PDA outlaws discrimination against women because of or on the basis of pregnancy, childbirth or related conditions with respect to compensation, terms, conditions or privileges of employment. 42 U.S.C. § 2000e-2(a).

One specific congressional goal in passage of the PDA was to make it unlawful to force pregnant woman who were not unable to work to take leave that they had not requested. Outmoded notions and paternalistic protections regarding pregnancy were to give way to equal treatment for women. For example, the Senate Report noted:

18

perhaps the most important effect of the PDA is to prohibit employer policies which forced women who became pregnant to stop working regardless of their ability to continue. . . . For, as the history of sex discrimination shows, such policies have long-term effects upon the careers of women and account in large part for the fact that women remain in low-paying, dead-end jobs.

S. Rep. No. 331, 95th Cong. 2d Sess. 6 (1978).[11]

The history and effect of such policies were addressed in statements by House and Senate members as well as in testimony before the Committees considering the legislation. These statements emphasized the change in the American workforce to include a large percentage of women and the economic hardship faced by these women and their families when discrimination on the basis of pregnancy and related medical conditions occurs. By enacting the PDA, Congress rejected the outdated notions upon which many "protective" laws and policies were based, policies which often resulted "from attitudes about pregnancy and the role of women who become pregnant which are inconsistent with the full participation of women in our economic system," and which perpetuated women's second class status in the workplace. As the Supreme Court has stated, "[t]he reports, debates and hearings make abundantly clear that Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers."

*Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 646–47 (8th Cir. 1987) (quoting *Guerra,* 479

U.S. at 285-286) (internal citations omitted).

The protections of the PDA apply regardless of the stage of pregnancy. For example,

[e]mployment late in pregnancy often imposes risks on the unborn child, but Congress indicated that the employer may take into account only the woman's ability to get her job done. With the PDA, Congress made clear that *the decision* to become pregnant or *to work while being* either *pregnant* or capable of becoming pregnant *was reserved for each individual woman to make for herself.*

---

[11] The Supreme Court in *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721 (2003), similarly recognized this principle in regard to the passage of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*:

Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. Stereotypes about women's domestic roles . . . created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees. Those perceptions, in turn, Congress reasoned, lead to subtle discrimination that may be difficult to detect on a case-by-case basis.

538 U.S. at 736 (internal quotations and citations omitted).

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 205–06, 111 S. Ct. 1196, 1207, 113 L. Ed. 2d 158 (1991) (internal citations omitted) (emphasis added).

The Supreme Court clarified in *Young v. United Parcel Service, Inc.*, 135 S.Ct. 1338, 1352 (2015), that the first clause of the PDA, § 2000e(k), that is the language providing "*[t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions*," reflects Congressional disagreement with the reasoning of *Gilbert* by including pregnancy discrimination within the definition of discrimination "because of sex" or "on the basis of sex." *Young*, 135 S.Ct. at 1352. The second clause, providing "*and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise*," is not simply a further definition of sex discrimination to include pregnancy discrimination, because that interpretation of the statute would violate the rule against superfluidity. 135 S.Ct. at 1352. Rather, the second clause is directed at overturning *Gilbert*'s holding that an employer could treat pregnancy less favorably than diseases or disabilities that resulted in a similar inability to work, such as where an employer denies a requested accommodation or benefits that are extended to others. 135 S.Ct. at 1353. The EEOC does not proceed here under the second clause as Macioce had not requested any accommodation or challenged the provision of benefits. The EEOC proceeds instead under the first clause of the PDA.

20

With the passage of the Civil Rights Act of 1991, a plaintiff need only show that the prohibited consideration was "a reason" for the employer's action challenged under Title VII:

> [a]n unlawful employment practice is established when an individual demonstrates that pregnancy or a pregnancy-related condition "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). *See Robinson v. Southeastern Pa. Transp. Auth.,* 982 F.2d 892, 899 & n. 8 (3d Cir.1993) (noting the 1991 Civil Rights Act "overrul[ed] that portion of *Price Waterhouse* that permitted an employer to avoid liability if it could demonstrate that it would have taken the same action in the absence of discriminatory motive").

*Deneen v. Northwest Airlines, Inc.,* 132 F.3d 431, 435–36 (8th Cir. 1998); *see also Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 364 (3d Cir.), *order clarified,* 543 F.3d 178 (3d Cir. 2008) ("[T]he prohibition [against pregnancy discrimination] is breached 'whenever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision.'").[12]

## B.    Direct v. Indirect Evidence

Disparate treatment based on the prohibited consideration of a woman's pregnancy "is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate." *C.A.R.S.,* 527 F.3d at 364. The parties are fully entrenched in opposing views as to whether this pregnancy discrimination case should be analyzed as a direct evidence case, as the EEOC urges, or as an indirect evidence case employing the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as Bob Evans insists. Under either analysis, the

---

[12] A point of emphasis is in order. Bob Evans repeatedly points in its briefing to an assertion by Moreau that Macioce did not object when he told her he was removing her availability in the automated scheduling system. *See, e.g.,* (ECF No. 65 at 5). Putting aside for the moment that the Assistant General Manager Giaquinto testified that she understood that Macioce was upset by the turn of events in scheduling, and viewing the evidence in the light most favorable to Bob Evans in considering the EEOC's motion, such that the Court also ignores Macioce's testimony that she repeatedly declined Moreau's request that she remove her own availability in the scheduling system, nowhere does the law require that the victim of unlawful discrimination prove that they protested that discrimination as an element of their Title VII discrimination claim. Title VII admits of no defense of "consent" to otherwise unlawful pregnancy discrimination.

material record evidence regarding the mid-July 2014 conversation and its wake is the same. Several weeks before Macioce went into childbirth and without any request by her for Moreau to do it, Moreau changed her availability in the scheduling system from a status that would automatically generate a schedule with her assigned work to a status that would not automatically schedule her for any work and then expected Macioce to call-in that she still was available to work to potentially obtain shifts. The undisputed evidence then establishes that any call-in by Macioce for work shifts could only be granted if shifts were available at that time ("holes"), after the automatic scheduling system already had generated a schedule without Macioce assigned to any work. And that same record conclusively demonstrates that when this happened, Macioce's level of work materially declined.

In arguing for summary judgment in its favor on liability, the EEOC analyzes this case only as one involving direct evidence. Accordingly, if the Court determines it is an indirect evidence case, it will deny the EEOC's motion as to liability. Conversely, Bob Evans does not request summary judgment in its favor nor contend that it is entitled to it on liability regarding the element of intent if this is a direct evidence case. Bob Evans does, however, contend that the EEOC cannot show the existence of an adverse employment action, regardless of the evidentiary framework by which the case proceeds. Thus, if the Court determines this is a direct evidence case, Bob Evans' motion on liability will be denied unless Bob Evans can show the lack of an adverse employment action as a matter of law. The additional matters on which Bob Evans and the EEOC base their summary judgment motions, discussed below, are aimed at damages and injunctive relief and apply whether or not this is an indirect or direct evidence case.

Direct evidence is evidence that would prove the prohibited intent without resort to an inference or presumption. *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994). "When

22

determining whether proffered evidence constitutes direct evidence of discrimination, [the court] consider[s] whether the evidence, if believed, compels the conclusion that [discriminatory] animus played a part in the challenged decision." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 383 (6th Cir. 2002). In order to constitute direct evidence, "the evidence must demonstrate that the 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002) (quoting *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)).

Statements made by the decision-maker related to the decision or decision-making process at issue and reflecting the motive for that decision constitute direct evidence of motive. Where statements are made either by a non-decision-maker, or are not related to the challenged decision, those statements might be characterized as "stray remarks" and if such, are not direct evidence of unlawful intent. *Weightman v. Bank of N.Y. Mellon Corp.*, 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) ("Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination.") Even if so-called stray remarks are not direct evidence, they do provide background evidence and can support a finding of pretext and discriminatory motive. *C.A.R.S.*, 527 F.3d at 368.

> If indirect evidence is used to prove discriminatory intent, the court employs:
>
> the familiar *McDonnell Douglas* burden-shifting framework to analyze her Title VII pregnancy discrimination claims. Under this analysis, the employee must first establish a *prima facie* case. If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination.

*C.A.R.S.*, 527 F.3d at 364 (internal citation omitted).

23

The Third Circuit in *C.A.R.S.* addressed the contours of a *prima facie* case of pregnancy

discrimination in an indirect evidence case, instructing:

> We have previously indicated that establishing a *prima facie* case of pregnancy
> discrimination differs from establishing a *prima facie* case of gender
> discrimination. In *Geraci [v. Moody-Trottup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir.
> 1996)], we . . . modified the first element of a *prima facie* case of pregnancy
> discrimination to require that an employer have actual knowledge of an
> employees' pregnancy, reasoning that "pregnancy, of course, is different in that its
> obviousness varies, both temporally and as between different affected
> individuals." *Id.* at 581. Therefore, in a case alleging pregnancy discrimination, . .
> . a plaintiff must adduce evidence that she was pregnant, and, that the employer
> knew it. *Id.* at 580–81; *accord Prebilich–Holland v. Gaylord Entm't. Co.,* 297
> F.3d 438, 444 (6th Cir.2002). . . . The next two elements of the *prima facie* case
> remain the same as those of gender discrimination. The plaintiff must be qualified
> for her job and she must have suffered an adverse employment decision. The
> fourth element requires that a plaintiff show some nexus between her pregnancy
> and the adverse employment action.

*C.A.R.S.*, 527 F.3d at 365.

Accordingly, if a plaintiff does not have direct evidence of discrimination, the "nexus"

must be established indirectly through evidence that raises an inference of discriminatory intent.

527 F.3d at 366, 370. On the other hand, "[w]hen direct evidence is offered to prove that an

employer discriminated, the shifting-burden analysis of *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . , is inapplicable and the case proceeds as an

ordinary civil suit." *Torre,* 42 F.3d at 829 (citing *Trans World Airlines, Inc. v. Thurston,* 469

U.S. 111, 121 (1985), and *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.1987)).

### *The Matter of Unlawful Animus*

Bob Evans contends that the EEOC must have evidence of discriminatory bias for this

case to be analyzed as one involving direct evidence, (ECF No. 76 at 3), in essence requiring an

ill-will type of motive. The case law at times refers to discriminatory "animus," as Bob Evans

suggests, (ECF No. 76 at 3) (*citing Mock v. Univ. of Pittsburgh at Johnstown*, Civ. Act. No.

24

3:04-314, 2007 WL 2253602, at *9 (W.D. Pa. Aug. 3, 2007)); *see also Weigel*, 302 F.3d at 383, and although animus may refer to hostility, negative feeling or "ill will," it also simply may mean "intention." BLACK'S LAW DICTIONARY 87 (6th Ed. 1990). To be sure, evidence of discriminatory animus in the sense of ill will is relevant to the matter of discriminatory intent and may be sufficient in some cases to establish discriminatory motive. The lack of such evidence, however, will not defeat a discrimination claim.

*The Carney* court aptly explained how ill-will is not a *sine qua non* for pregnancy discrimination, observing:

> [w]hile we have no doubt that the [defendant] harbors no ill motive against plaintiff or other pregnant women, history reveals that women have consistently been denied equal opportunities based on a professed concern for their well-being and/or unfounded notions about their capabilities. The PDA was enacted to ensure that pregnant women are judged on their actual ability and willingness to work, and although the [defendant] had no mandatory leave policy, its decision as to the plaintiff in effect forced her from the workplace at a time when she was willing and able to perform her job successfully.

*Carney*, 824 F.2d at 649 (internal citations omitted); *see also Deneen*, 132 F.3d at 436.

An employee is no less discriminated against where hatred based on their protected class status does not exist, but rather the decision-maker is motivated by perceived stereotypes and even paternalistic notions regarding the protected class status—whether or not any negative feeling or ill-will is harbored. This may be particularly so with pregnancy discrimination, and Congress in passing the PDA expressed its intent to prohibit employment decisions based on such well-meaning assumptions. With this in mind the Court turns to the record evidence of intent.

On the matter of whether this case is a direct evidence or indirect evidence case, consideration of *Deane v. Pocono Med. Ctr*, 142 F.3d 138 (3d Cir. 1998) *(en banc), Deneen*, 132 F.3d 431 (8th Cir. 1998), *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir. 1997), *Carney*,

25

824 F.2d 643 (8th Cir. 1987), *Gillin v. Federal Paper Bd. Co., Inc.*, 479 F.2d 97 (2d Cir. 1973), *Equal Employment Opportunity Comm'n v. Corinth, Inc.*, 824 F. Supp. 1302, 1309 (N.D. Ind. 1993), and *Peralta v. Chromium Plating & Polishing Corp.*, No. 1:99-CV-3996, 2000 WL 34633645 (E.D.N.Y. Sept. 15, 2000), demonstrates that the direct evidence analysis applies.

In *Deane*, involving discrimination based on perceived disability, the plaintiff produced uncontroverted evidence in the form of a call from the employer's human resources vice president indicating to the plaintiff that she was being terminated "because of her 'handicap.'" 142 F.3d at 149. The *en banc* Court of Appeals held that this was "direct evidence that Deane suffered an adverse employment action because of her employer's perception of her disability." 142 F.3d at 149.

*Martinson v. Kinney Shoe Corp.*, 104 F.3d 683 (4th Cir. 1997), cited with approval by *Deane*, 142 F.3d at 149, held that the record evidence, which showed the employer concededly took adverse action against an employee on the basis of a statutorily protected class, required nothing more to establish unlawful intent—that is, unlawful discrimination based on the prohibited consideration. 104 F.3d at 686. Likewise, in *Carney*, the court of appeals reversed the district court's decision to analyze the case under the indirect evidence burden-shifting framework. It determined that the plaintiff had presented direct evidence of pregnancy discrimination where the employer admitted its decision was based on a condition that in turn directly arose from pregnancy and the employer had placed the employee on leave without the employee's request. 824 F.2d at 648.

The Second Circuit in *Gillin* considered as direct evidence of a discriminatory failure to promote the uncontested statements by the individual tasked with making recommendations for a

position, including statements that the position was not suited to a woman, the position was a "man's post," and that he did not consider the female applicant for the position.

Similarly, in *Deneen* the court held that when the employer required that the pregnant employee have a note from a doctor to show that she could perform her job requirements, the case properly was analyzed as a direct evidence case. That court explained: "[w]ithout any real knowledge of a physical limitation, Mr. Holme stated that Mrs. Deneen could not return to work from layoff status without a note from her physician because of her pregnancy-related condition." *Deneen*, 132 F.3d at 436. The court rejected the employer's contention, similar to Bob Evans' position here, that a "simple" reference to protected status without expression of "bias" because of that status cannot constitute direct evidence of discrimination. In rebuffing this approach, the court observed:

> [t]his principle may apply with regard to the secretary's initial inquiry as to whether Mrs. Deneen was pregnant. There is evidence, however, that NWA did more than merely refer to Mrs. Deneen's pregnant status in this manner. Mr. Holme's initial statement that she could not return to work was expressly based on her pregnancy-related condition, a condition he only assumed to exist, and was made before Mr. Holme knew of any pregnancy-related physical restrictions. He did not simply refer to her pregnant status but made an adverse employment decision on the basis of his discriminatory judgment about her abilities or her propensity to use earned sick leave benefits. Additionally, the cases cited by NWA in support of its contention that mere reference to a protected status is not direct evidence of discrimination are distinguishable. For example, in *Philipp v. ANR Freight Sys., Inc.,* 61 F.3d 669, 674 (8th Cir.1995), the plaintiff claimed that one decision maker's occasional reference to him as "the old man" amounted to direct evidence of age discrimination when he was terminated as part of the defendant's reduction in force. We held that these references were nothing more than stray remarks in the workplace, because no evidence linked the remarks to the challenged employment decision. *Id. See also Geier [v. Medtonic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996)] ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process."). In the present case, Mr. Holme's remarks about Mrs. Deneen's pregnancy-related complication were made contemporaneously and directly in connection with the adverse employment decision. Her pregnancy-related condition was the reason [he] took her name off the duty list and refused to permit her to return to work.

27

We conclude the district court correctly determined that Mrs. Deneen presented direct evidence of discrimination.

132 F.3d at 436.

In *Peralta*, another direct evidence case, the employer required the plaintiff "to stop working solely on the basis of her pregnancy and her earlier miscarriage." 2000 WL 34633645, at *4. The defendants required the pregnant employee to provide a doctor's note to prove her fitness to continue working (a frequent theme in pregnancy discrimination cases), and placed her on unpaid medical leave when she did not produce a note. Likewise, in *Equal Employment Opportunity Comm'n v. Corinth, Inc.*, 824 F. Supp. 1302, 1309 (N.D. Ind. 1993), where the employer did not schedule the pregnant employee for further work because she was pregnant and had gotten "too big" and could "fall down" in the restaurant at which she was a server, the case was properly analyzed as a direct evidence case. There, the court stated that "[t]erminating a pregnant employee, or forcing her to take leave, because of concern for her health or concern for the employer's potential liability, are employment decisions based upon impermissible factors." 824 F. Supp. at 1302, 1308.

*Weightman v. Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693 (W.D. Pa. 2011), on the other hand, rejected the plaintiff's attempt to proceed on a direct evidence theory in a pregnancy discrimination case. The plaintiff's evidence included: the failure of the plaintiff's supervisor to exhibit joy over the plaintiff's announced pregnancy; discipline for excessive absenteeism and negative performance reviews occurring after she announced her pregnancy; and a statement made outside of the decision-making process and after plaintiff had been issued written warnings and counseled for her failure to improve that the plaintiff needed to make a decision between being a mom and having a career. 772 F. Supp. 2d at 707. The record evidence in *Weightman* required the consideration of an inference of discrimination in the

28

decision-making, and therefore, was not direct evidence of discrimination. Similarly, in *C.A.R.S.*, involving unequal treatment of persons on leave, the evidence required an inference as to the employer's intent and properly was considered as an indirect evidence case. There, the plaintiff, who required leave after terminating a pregnancy, had evidence that other employees who were temporarily disabled from work likewise failed to follow the same "required" call-off procedure to continue their leave but were not terminated as was the plaintiff. 527 F.3d at 366-67.

The record evidence here shows directly and without equivocation that the reason for Moreau's decision to remove Macioce from automatic scheduling was because she was pregnant and he believed her need for leave because of child birth (and nothing else) was imminent. Bob Evans attempts to argue that the reason Moreau took Macioce off of the schedule was not really because of unlawful consideration of pregnancy, but "because of Macioce's 'imminent', unpredictable leave," (ECF No. 65 at 14), and "was based on Moreau's understanding that Macioce was taking an imminent leave of absence with an unknown start date." (ECF No. 69 at 2). This argument simply doesn't hold water. Remember, Macioce had not requested leave for some undisclosed reason, since she had not requested any leave at all. And, in spite of Macioce personally telling Moreau she was pregnant, he had no discussion with her about her due date. ECF No. 58-3 at 17. Bob Evans argues that the pregnancy discrimination claim fails because "the sole reason Moreau took Macioce off the schedule was due to the unpredictability of her attendance. Specifically, Moreau had notice that an event causing the need for leave with an 'imminent' but unknown date was approaching." (ECF No. 65 at 13). But the testimony of Moreau is clear—his perception of Macioce—several weeks before Macioce actually delivered her baby—was that Macioce's attendance was "unpredictable" based solely on her pregnancy—

29

and is just the type of stereotypical judgment that Congress legislated against by enacting the PDA. Thus, the "unpredictability" here amounts to nothing more than a proxy for the only thing theoretically generating it—Macioce's pregnancy. Moreau was plainly aware of Macioce's pregnancy (she told him), and the only "event" of unpredictability was her then upcoming "childbirth" as a result of her pregnancy. The veil with which Bob Evans seeks to cover knowing and intentional pregnancy discrimination is patently transparent.

A similar justification offered by the employer in *Martinson* was flatly rejected. *Martinson* involved a plaintiff with epilepsy. The employer contended that it did not take the adverse action based on a disability, but only acted based on a characteristic of epilepsy— seizures experienced by plaintiff as a result of the disability. The Fourth Circuit observed:

> [t]o fire for seizures is to fire for a disability. . . Whether [the employer] fired Martinson because he suffered from epilepsy or because of the 'specific attributes' of his disease, *i.e.*, his seizures, is immaterial-both are disabilities and an employer may not use either to justify discharging an employee so long as that employee is qualified for the job.

104 F.3d at 687.

The treatment of Macioce here fares no better than did that of the employee in *Martinson*. The distinction offered by Bob Evans isn't really a distinction, but is tantamount to a concession of Title VII liability. To take action because of conditions precisely related to that pregnancy, and arising from that pregnancy alone, is to take action because of pregnancy. Moreover, Bob Evans' argument ignores that the considered "condition" involved here, childbirth, also is specifically included in Title VII's definition of "because of sex." An employment action taken based on the assumption that a woman will at some future date need leave (even unpredictably) because she is pregnant, including for childbirth, directly demonstrates the discriminatory motive for the action. *See Wagner v. Dillard Dep't Stores, Inc.,* 17 F.App'x 141, 150 (4th Cir. 2001)

30

(determining matter was properly addressed as a direct evidence case and affirming denial of motion for judgment as a matter of law and jury verdict in favor of plaintiff).

Bob Evans adds that "[a]t worst, the removal from the automated schedule was a result of an honest mistake based upon Moreau's belief that Macioce' expected leave of absence would begin in the very near future." [13] (ECF No. 65 at 14). But "beliefs" grounded in assumptions are just the stuff of which pregnancy discrimination claims like those present here are made, and just the stuff motivating Congress to outlaw them—particularly an employer's "beliefs" or "presumptions" about the work abilities of childbearing women. *See Wagner,* 17 F.App'x at 150 ("[W]e are certainly unprepared to take judicial notice of the physical abilities or limitations of women who bear children, other than to note that they would surely vary widely from individual to individual. Also, Wagner's testimony on this precise issue reflects an undisputed intent on her part to work up until delivery and to *not* take maternity leave."). This is a direct evidence case.

### *Discriminatory Intent as a Matter of Law*

The evidence that Moreau acted on presumptions regarding Macioce's pregnancy and childbirth is established by uncontroverted evidence in the form of Moreau's own testimony, and as set out in Bob Evans' own papers. Even viewing that record in the light most favorable to Bob Evans, the Court concludes that there is no genuine issue of material fact and the EEOC has established discrimination based on pregnancy as to Macioce's terms and conditions of employment as a matter of law.

---

[13] The record would not support such a conclusion. Here's why. Moreau testified that he learned of Macioce's pregnancy directly from Macioce, in the very same conversation in which he told her that she was "zeroed out" of the automatic schedule. He then says that at around the same time, he learned via "hearsay" from co-workers that Macioce's delivery was "close." ECF No. 58-3 at 13-18. But, as noted below, given that Moreau says that he first learned of the pregnancy from Macioce, and told her in the same conversation that she was "zeroed out," any such "hearsay" could not have been the basis for the "zeroing out."

This is not an extraordinary conclusion. Notably, *Carney*, *Martinson*, *Gillin*, *Peralta*, and *Corinth* also all held that the plaintiff was entitled to summary judgment on liability. In *Carney*, the employer admitted that its decision to place the employee on leave without her request was based on a pregnancy related condition. Thus, the plaintiff proved pregnancy discrimination based on direct evidence as a matter of law. 824 F.2d at 648. In *Carney,* the plaintiff like Macioce had not sought leave and was able to perform her job.

In granting summary judgment to the plaintiff on liability for pregnancy discrimination in *Peralta*, the district court also considered the narrow BFOQ exception to liability and determined that the employer did not have sufficient evidence to establish the exception, particularly because "[t]he only justifications that defendants provide[d] for their decision to forbid [the plaintiff] to work without a doctor's note were their concerns over her health, possible danger to her unborn child, and possible future tort liability," all of which were inadequate under the PDA and *Johnson Controls*. 2000 WL 34633645, at * 6. "It is no more appropriate for the courts than it is for individual employers to decide whether a woman's reproductive role is more important to herself and her family than her economic role. Congress has left this choice to the woman as hers to make." *Johnson Controls*, 499 U.S. at 211.

The PDA compels the conclusion that an employer cannot require a pregnant employee to stop working unless she is unable to work, preserving the decision to work to the woman's judgment in the first instance. 499 U.S. at 205. An employer cannot act to take away a pregnant employee's shifts because she will go into labor at some point. Nor can it place a roadblock in her path by taking her off of the automatic schedule (and thereby reducing her work opportunities) and effectuate the same result.

As discussed below, Moreau's admitted approach to scheduling Macioce for work after her July 2014 vacation operated on a presumption that, based on Macioce's pregnancy, she was unavailable for work unless she "called in" to request shifts and indicate she in fact was not unavailable to work due to her pregnancy. Moreau's determination that at any moment Macioce might be unable to work due to childbirth and should therefore be assumed to be unavailable for purposes of automatic shift scheduling was based solely on his belief that her due date, i.e., her unavailability to work due to childbirth, was imminent, which in turn was based on the fact of her pregnancy.[14] That decision amounted to impermissible discrimination based on her pregnancy. This is an unexceptional conclusion, since there is no other way to view it consistent with the edict in *Johnson Controls* that an assumption that a woman is incapable of working at any stage in pregnancy because of pregnancy constitutes unlawful discrimination "because of sex." Likewise, requiring pregnant women to verify that they continue to be able to work notwithstanding their pregnancy is similarly prohibited discrimination. The uncontroverted record evidence in this case directly and conclusively establishes that that is what happened here.

Bob Evans seeks to rationalize what happened to Macioce by asserting that it was done for the predictability of the schedule and that it was only using its "business judgment." (ECF No. 65 at 14). Anticipated inconvenience as to the predictability of the schedule is not a sufficient legal justification for discrimination. Whatever annoyance or difficulty Bob Evans perceived Macioce's pregnancy might cause it in scheduling, the PDA and *Johnson Controls* make plain that her pregnancy and related condition of childbirth were prohibited considerations.

---

[14] Moreau testified that at about the same time that Macioce told him she was pregnant and he told her (in the same conversation) that he was "zeroing" her out, ECF No. 58-3 at 17, he heard via "hearsay" in the restaurant that her delivery was "imminent." ECF No. 58-3 at 16. While arguably such out of court statements are offered by Bob Evans not for their truth, but only as to their effect on the listener (Moreau), and would not be hearsay, they don't change the outcome or analysis, since the law under Title VII and the PDA is clear—the employer is not free to make an assumption (whether or not supported by co-worker scuttlebutt) about a pregnant employee's fitness for work.

33

The Supreme Court instructs: "the incremental cost of hiring women cannot justify discriminating against them." *Johnson Controls, Inc.,* 499 U.S. at 211. This principle applies with equal force regarding the "cost" or "inconvenience" of continuing to employee pregnant women. Bob Evans' concern for a perfectly predictable schedule based as it was here on its assumptions about Macioce's pregnancy cannot shield its conduct.

In sum, there is no genuine issue of material fact that the direct record evidence establishes that *the* reason Macioce (1) was removed from the automatic scheduling system, (2) was expected to call-in as able to work before she would be permitted to work, and (3) was to be placed onto the schedule only if needed to fill a hole after the automatic schedule was generated—were Moreau's assumptions about her pregnancy and future childbirth. This was and is prohibited by the PDA. Accordingly, the EEOC has met its burden of demonstrating that there is no genuine issue of material fact on the matter of unlawful discriminatory intent.

## C. **Adverse Employment Action**

Bob Evans contends that even if the EEOC demonstrates discriminatory intent based on pregnancy as to Macioce, the EEOC cannot meet its burden to show that Macioce suffered any adverse employment action. (ECF Nos. 65 at 9; 69 at 9). If the EEOC can establish an adverse employment action as a matter of law to complete its claim, the EEOC will be entitled to summary judgment in its favor on liability. If, however, the evidence viewed in the light most favorable to the EEOC is inadequate to support a finding that Macioce suffered an adverse employment action, the Court must grant Bob Evans' motion for summary judgment on liability. If there is a genuine issue of material fact on this point, the broader liability issue will be submitted to a jury.

34

"In order to be entitled to relief, a plaintiff must have suffered a cognizable injury." *Storey v. Burns Intern. Security Services*, 390 F.3d 760, 764 (3d Cir. 2004). Title VII specifically prohibits discrimination in failure to hire, discharge and compensation as well as in the terms, conditions or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). A cognizable injury under Title VII is referred to as an adverse employment action, which the Third Circuit further defines as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey*, 390 F.3d at 764 (internal quotations and citations omitted). In addition to the failure to hire, discharge, changes in pay or compensation, which are enumerated in the statute, a transfer to a less desirable position or an unsatisfactory job evaluation may constitute the requisite adverse employment action as to the terms, conditions, and privileges of employment, but modest changes in duties or working conditions and actions that simply make an employee unhappy but not producing a material disadvantage do not. *King v. City of New Kensington*, Civ. Act. No. 06-1015, 2008 WL 4492503, at *10 (W.D. Pa. Sept. 30, 2008), *as amended* (Oct. 3, 2008); *see Johnson v. Community of Allegheny County*, 566 F. Supp. 2d 405, 430 (W.D. Pa. 2008) (adverse employment action in Third Circuit includes transfers to less desirable position).

Bob Evans relies on *Langley v. Merck & Co.*, No. 04-3796, 2005 WL 1279108 (E.D. Pa. May 25, 2005), *aff'd* 186 F.App'x 258 (3d Cir. 2006); *King v. City of New Kensington*, Civ. Act. No. 06-1015, 2008 WL 4492503 (W.D. Pa. Sept. 30, 2008), *as amended* Oct. 3, 2008; *Petro-Ryder v. Pittman*, Civ. Act. No. 15-2908, 2015 WL 8731623 (E.D. Pa. Dec. 11, 2015), *Moss v. Advance Circuits, Inc.*, 981 F. Supp. 1239, 1246 (D. Miss. 1997), and *DeMary v. Kennedy Health Sys.*, Civ. Act. No. 11-05984, 2014 WL 3748591 (D.N.J. July 30, 1994), to argue that the change in how it scheduled Macioce for work was not an adverse employment action at all.

(ECF No. 65 at 10-11). The EEOC points out in its response that these cases only involved schedule changes with no loss of hours and pay.

In *Langley,* for example, a race discrimination claim was brought pursuant to 42 U.S.C. § 1981. The plaintiff claimed her reassignment was an adverse employment action, but conceded that her pay and grade level did not change, and the evidence showed that her career opportunities and prospects for advancement remained the same and that at most she suffered inconvenience. The district court held that she failed to establish the existence of a requisite adverse action because "an adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" 2005 WL 1279108, at *3 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Our Court of Appeals affirmed, observing that a change in title, office, and reporting responsibilities without a change in pay or evidence that the new position was inferior did not suffice as an adverse employment action. 186 F.App'x at 260-61.

In *King*, the plaintiff police officer claimed pregnancy discrimination when she requested light duty for five months because she felt the municipality was "dangerous" and she did not feel safe to be on the road. Her request was denied, she only was given one month light duty, and her shift time was changed during the month of light duty. 2008 WL 4492503, at *2. The court determined that these were not adverse employment actions, explaining:

[a] shift change does not in and of itself amount to a material disadvantage. If there had been a reduction in pay or an effect on career prospects, the change might arguably rise to the level of a material disadvantage and an alteration of the terms, conditions, and privileges of employment. . . . Plaintiff only offered that the shift was inconvenient for her personally because of her particular circumstances (her husband also works the midnight shift and she wanted to be free during daytime hours to sell her home, build a new home, and prepare for her baby).

*King,* 2008 WL 4492503, at *11 (internal citations omitted).

36

Importantly, the Third Circuit specifically held in *Mondzelewski v. Pathmark Stores, Inc.*, 162 F. 3d 778 (3d. Cir. 1998), that depending on the case, a change in shifts alone may constitute the requisite change or alteration in terms, conditions or privileges of employment. 162 F.3d at 787. "Assigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions." 162 F.3d at 788. In *Mondzelewski*, the evidence supported the conclusion that the change in shift to a facially desirable shift was one that employees nevertheless viewed as undesirable and a punishment, and that would suffice as a change in the terms, conditions or privileges of employment. Here, Macioce was removed from the automatic scheduling process and was scheduled for work only where management could find "holes" or "gaps" in the schedule. This cannot reasonably be viewed as trivial or simply an inconvenience, where as here there was a marked drop off in Macioce's work frequency.

*Petro-Ryder* and *Moss*, relied on by Bob Evans, are inapposite. The court in *Petro-Ryder* determined that the change in shift did not constitute an adverse employment action because the plaintiff's own testimony contradicted the argument that the new shift was undesirable. 2015 WL 8731623, at * 8. In *Moss*, involving race discrimination, the district court determined that the denial of a requested shift change and the requirement that the plaintiff advise her supervisor ahead of time when she was requesting a schedule change did not rise to the level of adverse employment actions. 981 F. Supp. at 1246. Macioce, unlike Moss, did not request any shift change or complain about the nature of shifts received; the complaint here was centered on her elimination from the automatic schedule process and the resulting reduction in shifts.

*DeMary* also provides no support for Bob Evans' position. That case involved the plaintiff's challenge to the employer's "action" of only providing her with a copy of a two week advanced written schedule, instead of a copy of the full six week schedule. This did not

constitute an adverse employment action because the complete work schedule was available on-line and, although the plaintiff claimed she had to ask supervisors on a daily basis just which hours she was scheduled to work, the advanced schedule was accessible to her, she was not denied computer access, and she "could have just as easily logged on to the computer to view her schedule." 2014 WL 3748591, at *7. The court concluded that "the 'mere inconvenience' of doing so, and any associated 'inconvenience' in being unable to make long-term social plans, cannot give rise to an actionable claim." *Id.*

According to Bob Evans, the inconvenience Macioce faced by being removed from automatic scheduling process and having to call-in to obtain her shifts is insufficient as a matter of law to establish an adverse employment action caused by unlawful discrimination. (ECF No. 65 at 9). The Court agrees that an actionable adverse action, other than one causing a reduction in pay or compensation, must be more disruptive than a "mere inconvenience" to constitute a change in the terms, conditions or privileges of employment. But this is not a case like *DeMary* where the plaintiff complained she was not provided a copy of her schedule six weeks in advance, plainly only an inconvenience. The challenged action here is not the failure of her employer to provide an advance copy of the schedule she actually was on. It is that she was not on the generated work schedule at all and was expected to call-in to report that she was able to work and to then find available work.

Bob Evans' suggestion that a change from automatic to manual shift scheduling, (ECF No. 65 at 1), is not ever actionable is at odds with the undisputed evidence here, specifically the testimony of Moreau and Giaquinto, Bob Evans' own work records as produced in discovery and even Bob Evans' arguments in seeking summary judgment. What happened to Macioce was something different from a "mere inconvenience" in the form of a manual schedule. First, the

38

only shifts Moreau "manually" scheduled Macioce for (after removing her from automatic scheduling) were in the first week, as he testified. Second, after being removed from the automatic scheduling, Macioce could be scheduled to work only if needed based on gaps on the already automatically generated schedule—a schedule that Macioce no longer had the opportunity to be on. Third, Bob Evans' argument that Macioce cannot succeed on her discrimination claim because after August 22, 2014 she no longer called in, and therefore, failed in her efforts to "pick up shifts," (ECF No. 65 at 10), suffers from multiple flaws: she never asked to be taken off of the schedule in the first place; she did seek out shifts; and this argument is premised on the contention that Bob Evans lawfully could place such a requirement on her (one that Congress outlawed, namely requiring a pregnant woman to show her ability to continue working) while not placing it on non-pregnant employees.

The record is undisputed that Macioce suffered significant disruption in her terms and conditions of employment as established on the undisputed factual record, even when viewed in the light most favorable to Bob Evans. Here's why. The employment action challenged here effectively changed Macioce's terms and conditions from that of a regularly scheduled part-time shift worker to a *fill-in* part-time shift worker—with the uncertainty of such a schedule placed on the pregnant worker because she is pregnant and would at some point give birth—both of which are prohibited considerations under Title VII. *Cf. Schneider v. Jax Shack, Inc.*, 794 F.2d 383, 385 (8th Cir. 1986) (pregnancy discrimination case involving claim of constructive discharge wherein court recognized that "[e]mployers should not be able to avoid responsibility for discriminatory discharges by first demoting employees to part-time or fill-in status or by stringing out employees' tenures with nebulous commitments until the employees for their own economic well-being must 'quit.'"). The removal of Macioce from the automatic scheduling process

39

imposed a discrete burden on her. She would have no schedule of shifts, based on her pregnancy, unless she could find an available shift due to a "hole" in the schedule, or an increased staffing need at the restaurant, or because someone had called-off. This change based on pregnancy from a server on the automatically generated schedule to one relegated to doing fill-in work is discrimination in a term, condition or privilege of her employment. There is no genuine issue of material fact as to this and the record conclusively establishes that Macioce was removed from the automatic scheduling process and was relegated to "fill-in" worker status based on her pregnancy and the related condition of childbirth. This is a violation of the first clause of the PDA.

The Court will next address the call-in procedure Macioce was supposed to follow and that Bob Evans touts as simple and easy, along with Macioce's asserted failure to comply with it after August 22, 2014. Bob Evans insists there can be no adverse action here because all Macioce had to do was call-in and her shift requests would be granted. But any asserted failure by Macioce to call-in to in essence prove her availability to work cannot be held against her consistent with the PDA. Expecting her to call-in to obtain work in order to demonstrate that she was able to work despite her pregnancy was itself a discriminatory adverse action. Bob Evans' position is in reality a contention that a pregnant employee is at some point presumed to be unable to work unless and until she calls in to verify she is able to work and to ask for a work shift. In other words, the "simple" task required of Macioce to be able to come to work was that Macioce, who was the pregnant worker Bob Evans believed could go into labor "imminently," who had not indicated she would no longer be working as of some specific date, and who had not requested any leave, was being required by her employer to repeatedly inform it that she intended to work, was not in labor, and though pregnant could work that day or the upcoming

week. This call-in requirement placed on Macioce, based on speculation of the anticipated effects of her pregnancy, is one that the PDA prohibits, *Johnson* counsels is untenable, and which is unlawful. *See* S. Rep. No. 331, 95th Cong. 2d Sess. 6 (1978); *Carney*, 824 F.2d at 646–47, 649; *Deneen*, 132 F.3d at 436; *Peralta*, 2000 WL 34633645, at *4. As with the change to "fill-in" worker status, the "call-in" requirement likewise constituted an unlawful adverse employment action based on pregnancy discrimination.

### *Discrimination in Compensation*

Finally is the matter of discrimination in compensation, a tangible adverse employment action specifically enumerated in the PDA. Bob Evans cites *Cham v. Station Operators, Inc.*, 685 F.3d 87 (1st Cir. 2012), to contend that whatever loss Macioce suffered regarding her hours and pay was in essence *de minimis* and not sufficient to meet that statutory standard. (ECF No. 65 at 12). The First Circuit in *Cham* determined that a full-time hourly employee's loss of shifts on three occasions and a reduction of hours in one particular week was insufficient to constitute an adverse action because it caused no loss in employee benefits, the plaintiff was not entitled to any particular shift, and plaintiff was not "guaranteed" any shifts or even forty hours per week. *Cham* required that the change in pay be something more substantial. The *Cham* court appears to have determined that the loss of "some" pay (compensation using Title VII's statutory language) could pass muster under Title VII despite being caused by unlawful discrimination, if the loss was not a big one.

Title VII does not contain a qualifier on the prohibition of discrimination in "compensation," such as requiring the loss of compensation to be "substantial," "significant" or "considerable." Moreover, what may not be significant in terms of an amount of loss to one employee may be quite significant to another. Facially, a reduction of shifts, and its resulting

41

reduction in compensation, will constitute an adverse employment action. *Mock v. Northampton County Sheriff's Dep't.*, Civ. A. No. 07-36-7, 2008 WL 2996714, at \*8 (E.D. Pa. Aug. 5, 2008); *Lidwell v. University Park Nursing Care Center*, 116 F. Supp. 2d 571, 584 (M.D. Pa. 2000). When an employee earns less compensation because of pregnancy discrimination, the PDA has been violated.

The evidence as to the amount of the hours and pay lost in this case is to a degree more unsettled. Bob Evans posits that after removing Macioce from the automatic schedule, Macioce's scheduled work was sufficiently "similar" to a four-day-a-week schedule, and thus, she therefore could not have suffered an adverse employment action. (ECF No. 72, at ¶ 19). Although Bob Evans' own records establish that Macioce worked 4.86 days per week on average before being taken off of the automatic schedule, assuming the four-day-a-week schedule it urges, a three-day-a-week schedule simply is not "similar" to a four-day-a-week schedule for these purposes. Why? It is 25% less in terms of earning opportunity. Moreover, the record reveals that Bob Evans scheduled Macioce for only two shifts for the workweek beginning August 7, 2014, which is the workweek for which the elimination from automatic scheduling was effective; for three shifts for the workweek beginning August 14, 2014; for one shift for the workweek beginning August 21, 2014; for no shifts the workweek beginning August 28, 2014; for no shifts the workweek beginning September 4, 2014; and for no shifts the workweek beginning September 11, 2014. Even if Macioce had been able to obtain a "similar" schedule as a fill-in through August 22, 2014, that would not get Bob Evans out of the fix it is in.[15] Bob

---

[15] Similarly, if the Court considered hours actually worked as indicated on the "raw punches," as opposed to days or shifts, once Macioce was given no scheduled work based on consideration of her pregnancy and childbirth as of August 23, 2014, discrimination in her compensation is established on this record. The evidence produced by Bob Evans shows not only that Moreau changed Macioce to a "zero" for automated scheduling but that although Macioce was scheduled for five shifts a week in each of the workweeks beginning July 31, August 7, and August 14, Moreau also took the steps necessary to delete her from the schedule for 11 of 15 of those shifts.

Evans' argument fails to consider the effect of the zero-days-a week it scheduled Macioce to work by the workweek beginning August 28, 2014. The reduction in hours and resulting pay to zero establishes the existence of an adverse employment action because of pregnancy discrimination. There is no genuine issue of material fact and a reasonable jury would be compelled to find on this record that Macioce suffered an adverse employment action because of pregnancy discrimination. Thus, the EEOC's claim is complete as to liability.[16]

In sum, the discriminatory removal of Macioce from the automatic scheduling process, relegating her to fill-in worker status, requiring her to "call-in" in order to show her availability, and the loss of work and accompanying pay are adverse employment actions that altered Macioce's compensation, terms, conditions and privileges of employment because of her sex. The Court concludes that there is no genuine issue of material fact that Macioce suffered sex discrimination prohibited by Title VII based on her pregnancy. Accordingly, Bob Evans' motion for summary judgment based on lack of an adverse employment action is denied and summary judgment will be granted in favor of the EEOC on liability.

---

[16] There is some dispute as to the precise amount of shifts and pay Macioce ultimately lost as a result of the discrimination. The EEOC does not seek summary judgment as to the amount of back pay damages that should be awarded. According to the EEOC, Macioce worked a five-day-a-week schedule and "would have been scheduled for up to twenty five shifts by the automated scheduling system, had it not been for Moreau's interference. Instead, she worked the remaining three shifts that the automated system scheduled her for, and an additional five she was able to get by filling in where there was a need." (ECF No. 71 at 2). The EEOC has also asserted specifically that Macioce lost pay in the amount of $948.96. (ECF No. 64-5 at 3). Bob Evans contends there was little or no loss in pay because Macioce ultimately worked a substantially similar schedule compared to the four-day-a-week schedule that Moreau had indicated she usually worked (even though she was not scheduled for work at all after August 22, 2014). (ECF No. 65 at 10). There also is some evidence that the final schedule ultimately worked by servers between July 31, 2014 and September 12, 2014 due to the restaurant's actual scheduling needs had less servers working than that generated by the automatic shift scheduling system. (ECF No. 71 at 6) (citing ECF Nos. 70-21; 70-22 [Exs. T and U]). Ultimately, the exact amount of back pay that the Court should award is a determination for a later date. *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311, 317 (3d Cir. 2006) ("Given the statutory language, and the language in *Landgraf* [*v. USI Film Products,* 511 U.S. 244 (1994)] distinguishing the former remedial structure allowing back pay from the new structure allowing compensatory damages, it is obvious that back pay remains an equitable remedy to be awarded within the discretion of the court.") (internal citation omitted)).

## D. Damages

### 1. Compensatory Damages for Emotional Distress

As observed in *Spencer v. Wal-Mart Stores, Inc.,* 469 F.3d 311 (3d Cir. 2006):

[t]he Civil Rights Act of 1991 expanded the recovery allowed under the 1964 Act and permitted compensatory damages. [*Landgraf v. USI Film Products*, 511 U.S. 244, 252–53, 114 S.Ct. 1483 (1994)]. Compensatory damages include "'future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" *Id.* at 253, 114 S.Ct. 1483 (quoting 42 U.S.C. § 1981 a(b)(3)).

469 F.3d at 316.

Bob Evans argues that it is entitled to summary judgment on the EEOC's request for emotional distress damages because although Macioce testified that she was stressed and depressed, she has not demonstrated: 1) that she was diagnosed with depression; and 2) that "her depression was caused by the two-week period in which she was required to call-in to be manually scheduled for shifts." (ECF No. 65 at 20). Bob Evans further argues that because Macioce's description of her stress was *only* that it made her depressed, (ECF No. 65 at 7 & n.3), because she does not have evidence of a diagnosis of depression, and because she previously had received "psychological therapy" unrelated to her employment at Bob Evans, she is not entitled to compensatory damages as a matter of law.

*Bolden v. Southeastern Pennsylvania Transp. Authority*, 21 F.3d 29 (3d Cir. 1994), explains that because of the broad remunerative purpose of the civil rights law, expert testimony is not required to establish or corroborate a claim for emotional distress. 21 F.3d at 34; *see also Ridley v. Costco Wholesale Corp.*, 217 F.App'x 130, 136-137 (3d Cir. 2007) (observing that jury awards for emotional distress damages are properly upheld without medical testimony). Additionally, that a person previously treated for psychological issues may be probative as to the cause of the emotional distress claimed, but it would not automatically preclude such recovery.

44

Bob Evans asserts as fact that any emotional distress Macioce experienced was necessarily unrelated to any discrimination by Bob Evans. (ECF No. 65 at 20). Macioce testified that she suffered emotional distress from financial issues. When asked to describe the situation, she explained that at the time she delivered her child, "We had no money. . . . My husband, his job, there was a lack of work right around the time I had my son." (ECF No. 64-1 at 9). She also indicated that she was depressed. Bob Evans relies on Macioce's deposition testimony that she experienced financial stress when her husband had issues with lack of work to necessarily mean that Macioce had financial stress *solely* relating to her husband's employment situation. This does not fully represent Macioce's testimony, particularly when viewed in the light most favorable to her as the non-moving party. Macioce testified that due to a lack of work for her husband around the time she was discriminated against they "had no money," that when her husband had work "money was okay," and when he did not have work "money was not okay." But this is not the same as testimony that any financial stress as a result of the cutback in her shifts did not cause any emotional distress. Consistent with her financial struggles, Macioce had approached Moreau in April of 2014, seeking full-time work. (ECF No. 64-1 at 22, 26 [Macioce Dep. at 102, 108]. One reasonable inference from the evidence as a whole is that the reduction in Macioce's own compensation as a result of the reduction in shifts resulted in her experiencing additional financial stress—not that the *only* stress was due to the lack of work experienced by her husband.

There also is evidence in the record that Macioce experienced frustration with the decision by Moreau to remove her from the automated scheduling, particularly where Moreau knew of her expressed desire for full-time work, knew she wanted to work until she delivered her baby, and knew she did not want her availability changed to zero, yet changed her availability in

the system to zero so he would not be "screwed" by her going into labor. *See Ridley v. Costco Wholesale Corp.*, 217 F.App'x 130, 136-137 (3d Cir. 2007) (testimony at trial on emotional distress that included financial distress and frustration supported an award of emotional distress damages). Macioce's Declaration further provides that when she returned from vacation and found herself with dwindling shifts, she felt humiliated and experienced anxiety regarding finances. (ECF No. 70-4 at 3). Viewing these facts in the light most favorable to Macioce, the question of any entitlement to compensatory damages, including emotional distress damages, remains for a jury to decide. Accordingly, Bob Evans' motion for summary judgment as to emotional distress damages will be denied.

## 2. Punitive damages and the good faith defense

Bob Evans contends that it is entitled to summary judgment as to punitive damages, and alternatively, that it is entitled to a limit on the amount of punitive damages prior to trial. In turn, the EEOC contends that it is entitled to summary judgment on Bob Evans' anticipated assertion of a good faith defense to punitive damages. Both motions will be denied.

Section 1981a governs damages for intentional discrimination in employment. It provides:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1). The Supreme Court, in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999), explained:

> § 1981a's focus on the employer's state of mind gives some effect to Congress' apparent intent to narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination. The employer must act with "malice or with reckless indifference *to the [plaintiff's] federally*

46

*protected rights.*" § 1981a(b)(1) (emphasis added). The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

527 U.S. at 535.

Under this standard, "an employer must at least discriminate in the face of a perceived

risk that its actions will violate federal law to be liable in punitive damages." 527 U.S. at 536.

[Although] [e]gregious misconduct is often associated with the award of punitive damages, . . . the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. Conduct warranting punitive awards has been characterized as "egregious," for example, *because* of the defendant's mental state. That conduct committed with the specified mental state may be characterized as egregious, however, is not to say that employers must engage in conduct with some independent, "egregious" quality before being subject to a punitive award.

527 U.S. at 537 (internal citations omitted). Nevertheless, "evidence of egregious misconduct

may be used to meet the plaintiff's burden of proof." 527 U.S. at 546.

*Kolstad* acknowledged that:

[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

527 U.S. at 536–37.

In addition to defining the contours of punitive damages awards, *Kolstad* recognized a good faith exception to punitive damages claims, acknowledging that giving protection from punitive damages for an employer's good-faith efforts aimed at preventing workplace discrimination would accomplish Title VII's objectives by motiving employers to detect and deter discrimination. 527 U.S. at 546.

47

Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, . . . in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII.

*Kolstad*, 527 U.S. at 545 (internal quotations and citations omitted).

Although it is the plaintiff's burden to prove any entitlement to punitive damages, our Court of Appeals has left open the question of whether *Kolstad*'s "good faith" standard is an affirmative defense for which the employer shoulders the burden. Specifically, in *Medcalf v. Trustees of University of Pennsylvania*, 71 F.App'x 924 (3d Cir. 2003), the Court noted but declined to resolve the issue because the defendant had failed to object to the lack of a *Kolstad* charge to the jury at trial and "waived any argument that its good faith efforts to comply with Title VII preclude[d] the imposition of vicarious liability for [punitive damages]." 71 F.App'x at 933. The *Medcalf* court recognized that several appellate courts had held that the "good faith" standard is an affirmative defense. 71 F.App'x at 933 n.3. *See Zimmermann v. Assoc. First Capital Corp.,* 251 F.3d 376, 385 (2d Cir. 2001); *Romano v. U-Haul, Int'l,* 233 F.3d 655, 670 (1st Cir. 2000); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 286 (5th Cir. 1999)). *Passantino* points out that *Kolstad* essentially expanded the defense to liability for hostile work environment claims enunciated in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), to claims for punitive damages under Title VII, 212 F.3d at 516, and the *Burlington* defense is an affirmative one on which the employer has the burden of proof. 524 U.S. at 765. This Court finds *Passantino*'s reasoning persuasive that the "good faith" exception to punitive damages is an affirmative defense for the employer to prove.

48

The EEOC claims that Bob Evans' policies are so inadequate on their face such that it could never satisfy the "good faith" standard established in *Kolstad* because those polices are too general and do not expressly prohibit pregnancy discrimination. In arguing for summary judgment, the EEOC cites to a portion of the Employee Handbook that refers only generally to providing equal employment opportunity, and that personnel actions will be taken in a non-discriminatory manner. (ECF No. 59 at 12). Bob Evans' 2014 Employee Handbook policies, however, provide more detail than the EEOC acknowledges, containing separate harassment and anti-discrimination policies, and including an open door policy with alternative avenues to report workplace concerns, such as direct reporting to the Human Resources Department if an employee is uncomfortable with other lines of reporting. Additionally, although Moreau did not recall specific anti-discrimination training as he became a General Manager, Moreau had acted to ensure that new employees received the anti-discrimination materials contained within the Handbook, by going over anti-discrimination and open-door policies and obtaining signatures acknowledging them, and Macioce herself had acknowledged receipt and review of the May 2014 handbook.

The cases relied on by the EEOC, (ECF No. 59 at 13-15), largely involve an employer's failure to obtain summary judgment in its favor and against the plaintiff on the good faith defense to punitive damages, and do not support the EEOC's contention that it is entitled to summary judgment as to the good faith defense in this case. While an employer's failure to establish specific Title VII compliance efforts or its response to an employee's complaint, such as Macioce's expressed displeasure to Giaquinto, may prevent a determination that an employer has acted in good faith efforts as a matter of law, *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999), consideration of *E.E.O.C. v. Aldi, Inc.*, No. CIV A 06-01210,

49

2008 WL 5429624 (W.D. Pa. Dec. 31, 2008), convinces this Court that Bob Evans is entitled to have a jury decide whether it can establish the good faith defense to punitive damages laid out in *Kolstad.*

The court in *Aldi* rejected a motion *in limine* made by the plaintiff as to the good faith defense in a religious discrimination case, noting:

> [t]he disputed evidence references Defendant's policy of preventing "discrimination of any kind," and is therefore, relevant to Defendant's defense that it made good faith efforts to comply with anti-discrimination laws under *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). To the extent that Plaintiffs have objected to the disputed evidence on the basis that it does not sufficiently address the issue of religious discrimination, Plaintiffs will have an opportunity to cross examine Aldi's witnesses as to same. Accordingly, Plaintiffs' motion is denied.

2008 WL 5429624, at *5 (internal citations omitted) (denying motion *in limine* on good faith defense).

Following the reasoning in *Aldi*, that Bob Evans did not expressly list pregnancy discrimination in its anti-discrimination policy does not take the application of the good faith defense away from the jury. The defense to a punitive damages claim in this case, including consideration of the nature and extent of the training given on Bob Evans' anti-discrimination policy to its management and servers such as Macioce, as well as its formal policies, are matters left for decision by the jury. *See Ridley v. Costco Wholesale Corp.*, 217 F.App'x 130 (3d Cir. 2007) (affirming summary judgment in favor of employer on good faith defense where it was undisputed that employer maintained policies against discrimination, had an open door policy for reporting discrimination, and also consistently acted to enforce its anti-discrimination policy and provide detailed training to supervisors regarding discrimination). Viewing the evidence in the light most favorable to Bob Evans, Bob Evans can show that it had anti-discrimination policies, required review of the policies by management and by employees, including Macioce (who

50

acknowledged receiving and reviewing the May 2014 version of its policies), and had open door policies and alternate avenues to raise issues of discrimination, and a reasonable jury could find on this record that the conduct of Moreau was contrary to the good faith efforts of Bob Evans to comply with Title VII. Thus, the EEOC's motion for summary judgment on the good faith defense will be denied.

Turning to Bob Evans' motion for summary judgment on the basis that the EEOC cannot show entitlement to any punitive damages, viewing the evidence in the light most favorable to the EEOC, a jury could find that Moreau knew that pregnancy discrimination was unlawful, yet proceeded in his conduct because he was concerned that Macioce's pregnancy and future childbirth would "screw him over" on scheduling, knew that Macioce desired to work full-time[17] but dissuaded her, knew that Macioce intended to work until she delivered her baby but acted in direct disregarded Macioce's specific request that her availability in the automatic scheduling system not be changed to zero; Bob Evans' anti-discrimination policy did not specifically prohibit discrimination based on pregnancy; and Bob Evans did not expressly train its managers on pregnancy discrimination issues nor provide specific anti-discrimination training to General Manager Moreau. Based on the record facts, a reasonable jury could find the discrimination against Macioce based on her pregnancy was with malice or was in reckless indifference to her federal rights and as a result could find Bob Evans liable for punitive damages.

Bob Evans' additional assertion that prior to a jury determining *any* entitlement to amounts of compensatory and punitive damages, that the amount of punitive damages should be limited by the Court as excessive because the award necessarily would be disproportionate to any compensatory damages the jury could award, (ECF No. 65 at 23-24), is premature. Argument

---

[17] There is testimony by Macioce that she had indicated to Moreau that she would like to be a full-time server and he persuaded her against it based on her pregnancy by telling her that he "didn't think it was a good idea because [she] would be taking a leave in near future." (ECF No. 64-1 at 22, 26 [Macioce Dep. at 102, 108]).

for a remitterur, including application of the statutory cap on such damages, *see* 42 U.S.C. § 1981a(b)(3), if necessary, may be made in the event of an award the amount of which Bob Evans thereafter contends is unlawfully inappropriate. Accordingly, Bob Evans' motion for summary judgment as to punitive damages is denied.

### 3. Injunctive Relief

Bob Evans also seeks summary judgment on the EEOC's request for injunctive relief. As provided by 42 U.S.C. § 2000e-5(g)(1):

[i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5.

According to Bob Evans, the EEOC is not entitled to any injunctive relief as a matter of law because the request for such relief in its Complaint is too broad and the EEOC has no "evidence to show a cognizable danger of recurrent violations." (ECF No. 65 at 2). Specifically, in the Complaint, the EEOC requests as relief that the Court enjoin Bob Evans, "its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in employment practices which discriminate on the basis of sex and/or pregnancy," (ECF No. 1 at 4, ¶ A [Prayer for Relief]), and order Bob Evans "to institute and carry out training, policies, practices, and programs which provide equal employment opportunities for all employees, including pregnant females, and which eradicate the effects of its past and present unlawful employment practices." (ECF No. 1 at 4, at ¶ B [Prayer for Relief]).

52

Relying on cases in which a court denied portions of requested injunctive relief, such as *Davis v. Richmond, Fredericksburg and Potomac R. Co.*, 803 F.2d 1322, 1328 (4th Cir. 1986), Bob Evans argues that the broad pleading request here amounts to an improper request for an injunction providing that Bob Evans "obey Title VII," subjecting it to future contempt sanctions for unrelated violations of Title VII. Bob Evans' position that no injunctive relief should be granted as a matter of law is contrary to the language of the statute, the instruction by our Court of Appeals in *NAACP v. North Hudson Regional Fire & Rescue*, 665 F.3d 464, 484-86 (3d Cir. 2011), and even some of the cases that Bob Evans cites. *See Davis*, 803 F.2d at 1328 (reversing only as to a sub-paragraph of injunction entered by district court).

In *NAACP*, a case involving race discrimination, the Court instructed:

> [o]nce a court identifies racial discrimination, it must order relief that will remedy past discrimination and curb the potential for future discrimination. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965)). Although district courts are afforded substantial discretion in fashioning injunctive relief, it should not be broader than required to provide a full remedy to the injured party.

*NAACP*, 665 F.3d at 485.

Regarding the potential provisions of injunctive relief here and whether a cognizable danger of recurrent violation is present, the parties at trial (or a post-trial remedial hearing) will be able to put on their evidence, including evidence on Bob Evans' policies and practices regarding discrimination, now and then, the existence or lack of specific prohibitions and training on pregnancy discrimination, and the scope of any remedial response. The Court would then determine whether and to what extent any injunctive relief is required under applicable law and is appropriate in the circumstances. Bob Evans' present arguments are more suited to the nature and extent of that remedy, rather than its present efforts to forestall consideration of any

such injunctive remedy at all. Accordingly, Bob Evans' motion for summary judgment on injunctive relief will be denied.

## IV.   **CONCLUSION**

For the reasons stated in this Opinion, Plaintiff's Motion for Summary Judgment on liability for pregnancy discrimination will be granted, Plaintiff's Motion for Summary Judgment as to the "good faith" defense to punitive damages will be denied; Defendant's Motion for Summary Judgment will be denied in all respects. The remaining matters will be set for trial by further Order.

An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: August 17, 2017

cc:   All counsel of record